Good morning to all of you. My name is Dale DeLivo and I'm representing the Appellants in this case. I think at the heart of the case, your Honor, this issue of 102 Seconds of Dazing. You, the decedent, if you had a good temper, found the dazing to be a cause of death and characterized the manner of death as homicide. Given that the person who made me do this speech, some of the facts, is dead, we're hoping that your Honor's will scrutinize some of the facts. Given that normally on summary judgment, you assumed non-open parties' facts and take reasonable inferences from them. Mr. Jones, was it this was non-collision? These were not having his lights on? Although there's a... I can't get into this. The District Court's discretion is that you don't have standing. Right. I will address this as jurisdictional. That is correct. I agree with you. But I think the reason that I mention that is for two reasons. One, under the 14th Amendment, we believe the standing argument that the District Court has issue with, and I understand their issue, deals with the Fourth Amendment claim because that's the survivor claim. The 14th Amendment claim does not need that specific appointment. This is the claim for loss of child. It interferes with familial relationship. Right. We believe that... How old is Mr. Jones? He was 44. Okay. And there are at least some circuits that have suggested that after the age of maturity that this claim is no longer viable. There are some circuits, but not the Ninth Circuit. So the Ninth Circuit, in some of the cases, and there's many more, Smith v. City of Fontana, Johnson v. Bart, Colonel v. Ridge and Rest, and many others, hold that adult children, even when an adult children is killed, the parents have a right for a 14th Amendment claim. You know, and if we get past that, then my standard is that you have to show that the officers used force, shock, or conscience. In other words, the officers did not, they had a purpose to harm, but they intended to harm, terrorize, or kill. That's under our law. It reveals Osborne. Correct. So what evidence do you have in that? Well, I'd like to address that if I can. It is true that the Porter v. Osborne case says in a 14th Amendment you have this shock and conscience standard. And it goes on further under Porter to say they intended to harm,  I think the case then tries to differentiate situations where the officers have some time to deliberate, as opposed to situations where they do not. Obviously, if an officer has to make a split-second decision, they see someone with anything to be a gun in their hand. I wasn't aware. Doesn't the evidence show here that the officers were continually attempting to place the defendant in custody of the decedent? A legitimate law enforcement objective, and they didn't do anything without having that be their attempt, their intent. Is there anything in here that says there's any intent in this situation except attempting to place the decedent in custody? Well, I would argue that just the one I would say, and admit among there's a factional dispute, if the officers had time to deliberate as they're continuing to tase. I can understand an argument, Your Honor, with perhaps the first tase. But once the decedent is down, pinned against a tree, with his arms underneath him, and that should be four officers securing him to continue tasing him, but one officer for 92 seconds. As you, I'm sure, are aware, in order to get anything over five seconds, you have to keep the detrigger pressed. In some of those tases, there's 13 seconds and 19 seconds, and then we have the simultaneous. So at that point, during that last part of the tase in which Levy was dead, we would argue, number one, that the officers acted with deliberate indifference. And that standard applies, and it might be a factual question for a jury if they had time to deliberate. Well, it's not a factual question because the judge is first of all going to give them the law. And I guess I'm still trying to figure out why our case of Porter v. Osborne makes it such that they wouldn't give them any indifference standard because they would be talking about whether the officers intended to do so. Well, I think the preliminary question would be whether the officers had time to deliberate. If they did, then the case says that deliberate indifference applies. If they did not, then the case, as you previously stated, says there has to be a purpose to harm unrelated to a legitimate law enforcement objective. Quite frankly, I'm not sure anyone really knows what that means, and how we ever got there is probably a discussion for another day. Clearly, officers were acting within the course of their work as police officers. There's no suggestion that they were not sexually assaulting someone in the back of a car. But I think if something violates the Constitution, even before it's an excessive force, I think an argument could be made that that's not really related to a legitimate law enforcement objective. And although I would agree officers have a right to defend themselves, I think when you have a situation where they're claimed that repeated and prolonged case ramifications can cause someone's death, that was their admitted explaining on that point. We're talking about the facts under the circumstances, but there's no evidence of ulterior motives. There's no evidence of anything except you're suggesting that they had time to think about it. I realize what the time period was between the first time he was approached and they tried to arrest him until then. I realize what that time period is. You're saying that time period is not just enough for a question of fact. I do, but beyond that, I would say once he's prone with his arms underneath him, particularly when the other officers arrive, he has weight on his back. But the problem is with all of that argument is the arms underneath him. It's the same thing we had from the first. The arms underneath him were going through underneath or doing whatever he did. In each instance, the officers believed that it had to do with a firearm. I understand that argument, Your Honor, but I think— That's not an argument. It's what they're suggesting. It's what they're saying, yes. Really, and I have no facts against it. Well, the problem is you don't have any verbal threat by the decedent. You don't have any punch, any kick, any standing up. All you have is him down on the ground. He says at some point in the taser video, Stop tasing me, and I can't move. And obviously a reasonable interpretation, the reason he couldn't get his arms out from underneath him is because, number one, he's being tased for 102 seconds, and you can't do it while that's happening. And number two, he's got weight on his back, and he's pitting against your train. So really, the alleged resistance, if you think about it, after the initial going to the ground, is him essentially being immobilized by the staser. So can I get back to the standing issue? Because I realize this— I'm sorry. I got departed, but I just wanted to point out that it doesn't apply to the 14th Amendment complaint, and I think it was pointed out, well, that might be a different standard. In this case, and it's obviously high practice, primarily in California, and obviously in California, the successor in interest were the representative of the SCA and bring a survival action. We all know it's different in Nevada. You need to have actually the name of the administrator appointed and then made as a plaintiff. Unfortunately, in this case, and I'm not sure why this happened, at some point, the father was appointed as the administrator, and then there was a motion with the court. The father amended the plaintiff. So for instance, the estate, as a plaintiff, there was a stipulation from defense counsel. The court granted the motion. Quite frankly, I think that may have given us a false understanding that we had it right. Here's the court granting a motion to allow us to abandon the court. I want to make sure I understand from your perspective what's required by Nevada procedure. So Jones's father petitioned the probate court for the employment. Is that correct? Yes. The probate court is in order for his right to the employment. Yes. That doesn't apply to him. That's not sufficient. He has to then file the order in employment. Yes. I believe the step that you made. I believe the step that we missed is filing the order in the probate court. And that was done. Okay. The order was a petition. That was done eventually, but it wasn't done in April. But it was done and included as part of our MSJ opposition. No, you didn't. You filed it in November, I think. Is that right? You continue to look at it. Yes. You just filed it in April. The order is granted. That's correct. Especially the administrator. And then you failed to file it in the probate court. Okay. It was filed eventually in the probate court, but not when it should have been. It should have been filed immediately. Absolutely. And these filings are six months later. That's approximately correct. And there's no question, in looking back at this, we should have done something differently. But we think if you look at the Orlick case, for example, this case is a little different because you had John Jones as a plaintiff. He had an amended complaint with the estate. He was eventually appointed, and the board was on notice of that. Now, obviously, if I had to do it again at a minimum, I would have moved for 17-8 relief while the summary judgment was even pending. But we didn't do that. We waited until after the ruling, and then we moved for relief. But the court never gave us a response. And then the time came to file an appeal, and then the court didn't have jurisdiction. So here we are. I think in case of a meeting, it would be accurate to say that at the time of filing the amended complaint, which we have in front of us, that the petitioner was not authorized to file the complaint. That's a great question. I don't know. The reason I ask the question is standing is determined at the time the complaint is filed. I agree, Your Honor. So then I looked when was the first amendment complaint filed, and then I looked when he would have had any right to have standing, and it was after. I think technically you're probably correct, because I think at the time that it was filed, we assumed that he didn't have the standing, because that last step wasn't taken. I guess the point I'm trying to make, and I understand your concerns and the issues of my colleague who's opposing us, this is a death case. And so it seems to me since John Jones was the plaintiff, was appointed at some point, the court was aware of this, it's an easy case to at least get that worked out. We would hate to think that this whole case is going to be decided on that issue. Well, it is an old case, as you've already said. Well, it's a short amendment claim. Right, and a few other things. And I would qualify immunity, we feel, given the officer's training that they talked about, given the broad and even piercing case that originally came out of June of that year, and then in November, the law was enough to clearly establish, in conjunction with their own knowledge and training, that repeated dates for applications could cause death. Let me ask you another question. If I try to get by that, it seems to me that the termination of the proper party to sue is not difficult. I understand. I understand you. Well, that's why I'm just addressing the issue. If you wish it's not difficult, then I can't do anything about it. If it's understandable, I don't even know how I can say it's understandable. Well, I could be clear. Well, what did they say? I'd say it was 2020. I think at the time, it was understandable for the following reasons. There was a, obviously, we got him appointed, so there was some understanding that he needed to be appointed. We filed this amended complaint that the judge signed off on and agreed to name the esteemed, so I think it's pretty obvious. We thought, at that point, that's all we needed to do. Obviously, if we thought we needed to name him, not just as a plaintiff, the father, but as special administrator, we would have done that. So, I think, in that context, it's understandable. It certainly was a mistake, and I think it's one that, under the morality of 17A, that could be cured. It should be, we believe, for purposes of this case. Can I say a word about the state law claims? Yes. We believe there's clearly no immunity for the state law claims for two reasons. One, because the cases say that if there's any evidence, and remember, this is just the summary judgment stage of a constitutional violation, this discretionary immunity under Nevada law does not apply. If there's any evidence, whether it's a court-demanded violation or 14, we will see, taking all the facts in our favor, there is, and the second fall, I think it's Berkovitz, the Dobler test, the second fall is not meant, and there's cases, I believe, we cited in that regards, but if I read Nevada law correctly, it says, in the Gonzalez v. Las Vegas Metro Police Department, the decision whether to arrest or detain relates to policy objectives and thus is protected under Nevada's discretionary immunity state law. Well, there are others. So it seems to me that, at least for the claims that is relating to arrest or detain, they need to say it. It is possible, but the detention rights, however— I guess the only one where I see where you might have an interest is in battery because there is a case directly about battery that has nothing to do with the policy objectives. That's correct, Your Honor. So it looks like I'm briefly running out of time here, and you can go over your phone. Yes, I'll make one more comment. We didn't do what we should have done to get it right, but I think if you look at the overall record that he was employed in and we made the amended complaint and we brought it to the court's attention and our MSSA offered it again and after the ruling, we tried to get it right, and I do think it's an understandable mistake, and we're hoping that you'll set it back so that the judge can fix that issue and that the judge can consider the substantive issues. Now, if I have any time at the end, I'm sure I don't have any, but thank you very much. Okay, thank you. We'll be here for the rest of the time. The motion for summary judgment that we filed. Oh, I'm sorry. Let me tell you what the argument is. The argument is that Rule 1783 was never requested below, and in fact when they were provided the opportunity in responding to our summary judgment, they took the position that we're standing out of the pleadings. There is no decent jury here. So there is essentially a criticism. Well, they filed a Rule 17 motion after we presented it. They filed a Rule 17 motion. They were able to file a Rule 15 motion, and that was after judgment had been entered. And so Rule 15 motions cannot be considered after the court has been divested of jurisdiction. There's never been a Rule 17 motion filed in this case. The subsequent motion to amend the complaint after judgment had been ordered was pursuant to Rule 15. And I would also like to point out that the petition to appoint Mr. Jones has been filed, but the order appointing him to this day is not filed. In terms of the record 192 and 193, there is still no administrator appointed to this state as of statute. And what's lacking since the district court has obviously authorized it? They need to file the order, and then there's the purely ministerial act. Ministerial, and then there's the time for approval. They did file the petition, but they forgot to file the order. Correct. And so, technically, it's the very technical argument that there is still no administrator appointed as of this date. So, and then as we filed the order with the probate court, it was probably going to move. And that's probably as far as I care to know, because I'm not a probate lawyer. And so I couldn't speak with authority on that. Do I have a reason to be satisfied with that? Absolutely, and that was what our perception was when we filed our motion for summary judgment. It was a thorough motion for summary judgment, and it had about 70 pages, with the majority focusing on the merits. I've got about two pages in there on the standing issue, believing that Rule 17, it really would be requested, and as the law says, they're entitled to a reasonable time. They had it requested. They said, no, we're right. They're wrong. We're fine. We're resting our keys. And so what they really did was tie the hands of the district court. What did her say? I'm a little puzzled, because she said that they've moved to this. They have never filed a motion under Rule 17, yet the district court addressed it. So the district court's rule of motion? It was so to speak. The district court mentioned that the proper method would have been to raise a Rule 17 issue. And then he addressed that on the merits. He addressed the Rule 17 on the merits, because the district court addressed it on the merits. You're suggesting that there's a waiver, because they've never filed a Rule 17 motion. The district court went straight to Rule 17 and addressed it on the merits. So did we address that? I think the plaintiffs have laid that argument. It was not one they raised alone. They raised it in their raise, right? They did not raise it in the opposition's motion. So the district court did raise it and based its judgment in part on Rule 17. So Mr. Overlief, I'm going to get that under Rule 17. The district court did address it. Okay, that was my argument. It may have properly raised it in this court. They raised their Rule 17 in this court, right? Correct. Okay. So, yes, it may have been waived at some point, but the district court didn't raise its judgment on that and, in fact, addressed Rule 17. Correct. We raised Rule 17. The issue here is whether the court abused its discretion in denying Rule 17 relief. It was not requested. So absolutely, this court could have addressed it. And would you like to know why it wasn't? It was not an abuse of discretion because, as Judge Smith pointed out earlier, naming the correct party was not difficult. The Orlin case in NRS 41.1. Well, I mean, that's not to say it was a mistake. You yourself said you're not always on it. I mean, they thought they had done what was necessary, and they made a mistake. So to a case like this, it would probably end on a mistake that our case was used to address the opposite. Okay, so Rule 17, the interpreting of Rule 17 says that once the issue is raised, the party is entitled to a reasonable amount of time to correct. So an issue was raised in our summary judgment motion. In their opposition, where they had a reasonable time to correct it, they said, We are standing on those meetings. There is no decent. And so at that point, the reasonable time had run. And after they got to the courts... And that's what the district court makes its decision on? No, the district court makes its decision. So you keep talking about things, and on the opposite, the base of the district court's ruling, the enemy of the district court's ruling. So you're telling us that the district court had done something else, and there was another basis, and it's not helpful? Okay, so what's this particular thing that helps with your client? And so what the district court found then was that determining the correct wording was not difficult, that the plaintiffs never filed the proper paperwork during discovery, and that they never requested a fee for totaling. So the district court had three specific reasons why it was not granting a relief. One, it was not difficult. People were not filed. And the relief was never requested. And those are still grounds that, although you may disagree with it, it does not rise to the level of abusing the court's discretion. Because what the argument really is, is they didn't ask for the relief. They didn't want the relief. Well, what I would conclude, that there's something about the discovery case. I'm sorry? What we conclude so far is that they deliberately abandoned the case. No, there was no understanding to pursue the claims during the entire proceedings at the district court. We can't conclude anything other than they sort of pulled it their way and just couldn't figure it out? Well, that would be a subjective understanding. Well, what? Do you think they're not understanding? Well, the understanding is, yes. Do you think they deliberately threw the case? No, no, it was briefed. And they read our arguments. They could have at that point said, they're right. We made a mistake. Let us correct it. But I guess what I'm supposed to be talking about is the question of whether or not the other case on this is an understandable mistake. And I bet that's where the issue is. Yes, and what the district court said is that it's not an understandable mistake because determining the correct party is a bit difficult. Citing the Moreland case and then the matter by statute at 41.100. And so that was what the district court said. So I guess it's your determination, whether or not it's an abuse of discretion for the district court to conclude that that may have been an unreasonable mistake. But that mistake was also coupled with the fact that they never requested a relief. So it's kind of the totality of these factors as to why the district court was looking. Now, the district court said in the order the plaintiffs continue to act as if no defect even exists. So is the district court at that point supposed to say, this is relief you haven't asked for. This is relief you said you don't want. And I'm going to still give it to you even though you don't want it. Is that an abuse of discretion not to do that? And personally, I thought this case, I thought that they would ask for the Rule 17 relief in their opposition and they would be on demerits. That's why demerits were braced so heavily. Because if we go to demerits, as you were discussing under the 14th Amendment claim, before we even get to the 14th Amendment claim, they need to establish a 4th Amendment claim because of a lower standard, and it's a reasonable standard, in whether the officers would have been protected by qualified immunity for both the seizure and the force that was used. And I think it's clear in this case that at a bare minimum, the officers in this case would be entitled to qualified immunity for their actions. This was a multiple-tasing case that occurred during a time period when this court was addressing numerous day-tasing cases. I'm not on the right list. All the day-tasing cases I've seen involved 5 or 10-second bursts. I've never seen a case where individuals were tased for hundreds of seconds. Sometimes, probably a period with multiple bursts. I mean, where the officers and... Oh, okay, all right. Ms. Chayes, right? Yes. Where the officers kept on saying, you know, this is some sort of... Okay, well, I would refer you to the Marquez v. City of Phoenix case, which is the 2013 case in this circuit where the interceding was tased 22 times. And now, in this circuit, they found that it not only didn't address the clearly established issue, found that it was reasonable under the circumstances where the cases are of this point in tasers are whether or not the guy is down or he's not making these threatening words or gestures or the pressure came down, and he's down and he's saying, I can't move. Okay. And they keep tasing him and tasing him. Oh, I'm sorry. I don't mean to interrupt you. Well, so did you... Is this still a procedure in Las Vegas? Well, I will tell you, there's no longer policy because of the subsequent chaos decisions. But this is not part of the record. I apologize. But what police officers were doing during this time as tasers were initially considered to be vulnerable forces. Initially, that has changed now that they're intermediate forces. And there was a practice that was called cutting under power. When you couldn't get an individual handcuffed, officers were trained to try... Not dark mode, not the paralyzation taser mode, but drives them where you're at. You're just pressing the taser as a pain compliance tool into the suspect until the handcuffing was complete. It's called cutting under power. So an officer would tase under power until a person was caught. And now, because of the recent case law, it was the Taylor's case and so was Bryant, and that's no longer policy. Bryant came out 10 days before this decision. It was a dark mode case. But what Mateos and Bryant, what clearly established law they made is that it is not permissible to tase an individual who is non-resistant. So it's a passive resistance tool. But when you get into the cases involving Marquez, and there was a more recent one in the circuit in May of this year, which I probably shouldn't supplement the record on, I wrote to APK, Thomas v. Taylor, where the court found that tasing in laws obviously establishes when you're tasing a resistant individual. And when you say that Mr. Jones was not threatening, I would respectfully disagree. Officers hadn't really performed as an admirable police officer in getting up to the point where we're tasing. What changed the dynamic was you have a 6-foot, 230-pound Jones turning and confronting the 5'7", 172-pound hitter. And the taser frogs are in the front. So Jones was clearly approaching and advancing on him. So he may not be saying anything threatening, but he was acting threatening. And at that point, it became a physical altercation for this rather small officer. So... Yeah, you have the two of them on the scene, and the officer looks like, oh, taser, how are you? And you have four officers, it looks like she'll be a half alone during the majority of the tasing. Officer Fong-Wai-No behind us, and is using his baton to try to pry the arm out. Officer Inquish, when he hears this statement, there's something in his hand from Officer Fong-Wai-No, teases him once in the upper back with a drive stone. There's no affinity that moves to these methods, And then that's when the hand-hugging occurred, but all of this occurred in less than two minutes. It's certainly a dynamic situation where the officer's sole purpose was to get him into hand-hugs. And we're looking at it now with the benefit of 20-29 sight. We know what happened. We're aware, obviously Officer Head was unaware that he was on lethal levels of cocaine. And so there's stuff that's going on. But if you look at the Mark Jespers' City of Phoenix case, that was 2013. The appellate officer had done 22 tasings, was not unreasonable, and didn't even impress the early establishment. And the fact that the tasing happened around the same time this occurred, which he did do it, obviously, implied that it was observed the establishment officer had done multiple tasings, was, per se, unconstitutional at that time. But this wasn't multiple tasings. This was continuous tasing. It was nine taser discharges for about a minute and a half. And I believe that the Mark Jespers' case was one. And it was longer. Then you have a district court case that was referred by the 9th Circuit. I have an unpublished opinion. Sanders v. Fresno, which involved a similar length of tasing as this case, where the court found that the law was not observably established on this issue. So if you get into the merits of this case, and qualified opinion, and you can certainly imply to these officers that in this circumstance, this circuit has still not rendered a decision on when it becomes unconstitutional, unconstitutional to tasing, resisting. And that's a long way to go in the battery claim. The battery claim, the state law battery claim, in Davis v. City of Los Angeles, the appellate district court interest does depend on battery claim in an excessive force case. What the panel said in that case is that officers are immune from their use of force, unless it is attributable to benefiting them. And in this case, this was Davis v. City of Las Vegas, interpreting in RS-41. It was in 2007 by Jennifer Reinhart, because we were, I have a case, possibly in North Las Vegas Police Department, which is right from the state of Nevada, and it says, the level or degree of force an officer uses does not relate to the policy objectives and is not protected by the discretionary immunity. Huff is an unpublished decision, and there are other unpublished decisions that say that it is covered. And so I went with Davis in this case because it is a published decision by a public court, because Huff is an unpublished opinion. And it is certainly discretionary as to what type of force you're going to use. You're going to use a baton, or you're going to use a taser, or you're going to use pepper spray. That becomes an issue of discretion, or your stance. So the officer is using his discretion, and so they can only be stripped of their discretionary immunity if there is bad faith, or similar to the Chauce, the Constant Standard, and the Affordable Housing Act. I know I'm out of time. If you want me to address the 14th Amendment claim or anything like that, thank you for your time. Thank you. Thank you very much, Your Honor. Thank you all for your time. We'll give you a minute or so to talk. It's just very brief. I'll make a few comments, and then I'll answer any questions that you have. First of all, so that it's clear, and I think it is from the record, once the two probes are in, from the initial tasing, when you drive, stun the person on the third point in their body, there's an electrical circuit that goes throughout. So this really, for all intents and purposes, was getting full circuitry to a darker probe mode, and agreeing with Judge Kaczynski, I think we allowed the tasing, and I don't know, Sally, if you've had a chance to listen or to see the video from the taser video, and it being not only the duration of it, but the length of the consecutive tasings, really, in this case, is almost beyond belief. Counsel, with respect to the Rule 17 question, what did you do? What is your response to the district court's finding that you have never requested leave to a man to cure this defect, and instead, they, referring to the plaintiff's act, has had no defecting since? Well, I think... Did you ever ask the district court to correct what you understood, that there was a mistake? Yes. When did you ask? After the ruling, well, what happened, again, as I previously said, I wish that we would have done it during the pendency of the MSJ, but after the ruling came out. Then you went to the district court. But before the appeal, is why we made the request. When did you admit that you made a mistake? I think, I don't have it in front of me, but I think it'd be pretty clear, either explicitly or implicitly, that we got it wrong, and we needed, we wanted to get it right, because our concern at that time, and still our concern here, as has been discussed, is we didn't want the case to be decided on this technicality, which we really, to this day, believe was an understandable mistake. So, unless you have any other questions, thank you all very much. Mr. Sires, thanks for joining us.
judges: Kozinski, Bybee, N.R. Smith